UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNY HADO,

     Plaintiff,        Case No. 04-40357

vs.

               HONORABLE PAUL V. GADOLA
JO ANNE B. BARNHART,      HONORABLE STEVEN D. PEPE
COMMISSIONER OF SOCIAL SECURITY,

     Defendant.
_____/

**REPORT AND RECOMMENDATION**

**I.**  **BACKGROUND**

   Kenny Hado brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying his application for Disability Insurance Benefits (DIB) under Title II and Supplemental Social Security Income (SSI) under Title XVI of the Social Security Act. Both parties have filed motions for summary judgment which have been referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, it is Recommended that Plaintiff's motion for summary judgment be DENIED and Defendant's motion for summary judgment be GRANTED.

  **A.**  **Procedural History**

   This is an action by the Plaintiff, Kenny Hado, seeking judicial review pursuant to the Social Security Act, 42 U.S.C. § 405(g), of the final decision of the Commissioner of Social Security denying his application for DIB and SSI. See 42 U.S.C. §§ 416(I), 423(d) and 42 U.S.C. §

1382c(a)(1)(3).  Plaintiff applied for DIB and SSI on November 4, 1999,[1] claiming disability since

July 14, 2002 (R. 47) due to "back problems, kidney problems, diabetes mellitus, hypertension [and]

eye problems" (R. 61).  This claim was denied on April 19, 2004, after a February 4 hearing by

Administrative Law Judge ("ALJ") Gerald Freedman (R. 12-30).  The Appeals Councils declined

review (R. 5).

      **B.**     **Background Facts**

          **1.**      **Plaintiff's Testimony**

Plaintiff lives with his wife and three minor children (R. 201).  He was born May 15, 1959

(R. 202).  His education consists of finishing the seventh grade in Baghdad, Iraq.  He last worked

in July 2002 at the Detroit Metropolitan Airport in security as a baggage handler (R. 201-202).  He

stopped working at his doctor's instruction after his back began hurting (R. 203).

In his disability application Plaintiff indicated that he was disabled due to "back problems,

kidney problems, diabetes mellitus, hypertension [and] eye problems" (R. 61).  He explained that

the back problems "frequently limited his ability to work due to the fact that he could not lift heavy

objects nor stand or sit for extended periods of time (R. 61 and continued on 68).  He described his

diabetes as making his "general health weak as it affect[s]...kidneys and...eyes and make[s]

controlling ... blood pressure a difficult task" (R 68).

The back problems began in 1997 with a work related injury (R. 74).  The pain eventually

radiated from his lower back to his right shoulder and then neck and lower limbs.  The pain is

continuous and increases with walking, sitting for long periods, standing or carrying weight.  Pain

---

[1]The Administrative Law Judge indicates that Plaintiff originally filed an application for DIB in 1999; claiming disability since November 28, 1997, which was denied in 1997 without further appeal (R. 15), but the application and resulting denial is part of this record.

medication takes an hour to relieve the pain, lasts for about an hour and causes Plaintiff to feel dizzy and drowsy (R. 74-75).

Plaintiff reported that he was able to walk less than one half of a block due to pain (R. 75) or about 10-15 minutes (R. 209). A walk of this length would take him 20-25 minutes and would require 30-45 minutes of rest afterward. He could climb 5-6 stairs in ten minutes before he would need to stop for 25-30 minutes due to pain. He could stand 10-15 minutes (R. 77, 209) and lift less than 20 pounds (R. 77). On January 28, 2004, Plaintiff indicated in a supplemental form that he could lift 10 pounds or less (R. 84), and reiterated at his hearing that he could lift only 5-10 pounds (R. 210). He could sit no longer than 20-25 minutes due to his back pain (R. 210). He stated that he was limited in the use of his arms due to shoulder pain and in the use of his hands due to numbness. He is also limited in bending and lifting. His high blood pressure and hypertension cause him to feel dizzy during the day about three times a week, forcing him to lie down until he recovers (R. 210-211). His diabetes currently is not limiting his daily activities, but when his blood sugar is high he gets dizzy and his vision is impaired (R. 211-212). He has pain in his neck and right shoulder which can flare up to the point that it hurts when he tries to write (R. 214). He has headaches 3-4 times per week which last one-half hour and require him to lie down and preclude all activity (R. 215).

He visits with his family and friends twice a week for 45-60 minutes per visit, and attends church (R. 76). He requires the assistance of his wife and sister during these visits due to his pain.

He generally wakes up at 7:00 a.m, goes to bed at 10:00 p.m. and takes a one hour nap each day (R. 77). His sleep is disrupted due to pain. He has indicated that he requires assistance in bathing and dressing due to limitations in his movement, though on January 28, 2004, Plaintiff

3

indicated in a supplemental form that he could dress himself (R. 84).  He does not fix his own meals, do any work around the house nor any shopping (R. 78).  He does not read nor have any hobbies, but does watch television 30-45 minutes each day (R. 79).

### 2.  Medical Evidence

#### a.  Prior To Expiration of Insured Status on December 31, 2002 (R. 50)

Plaintiff visited his primary care physician, Frederick K. Lewerenz, D.O., on July 30, 2001, complaining of pain in his neck, upper and lower back and right shoulder due to automobile accident (R. 161-162).  Dr. Lewerenz found Plaintiff to be totally disabled from work at this time (R. 163), due to: cervical/thoracic/lumbar fibromyasitis, right shoulder strain, possible radiculopathy, possible HNP, cervical spasm, and narrowing of the disc spaces (R. 161).[2]

Plaintiff received physical therapy treatment in Dr. Lewerenz's office from July 2001 - December 2001.  Plaintiff always complained of achy, stiffness in his back which often radiated either into his right or left shoulder, sometimes into his neck, sometimes into his legs and sometimes caused him headaches (R. 146-48, 150-51, 154-55, 157, 159-60).

On August 17, 2001, Dr. Lewerenz saw Plaintiff for a follow-up visit and Plaintiff complained that the pain was not decreasing (R. 158).  He was having trouble sleeping due to pain, was experiencing numbness and his pain was radiating into his right lower extremities and right shoulder.  Yet Plaintiff did believe that the therapy was helping somewhat .  Dr. Lewerenz scheduled an EMG, continued Plaintiff's "no-work status" and physical therapy.

On August 28, 2001, Plaintiff visited Dr. Lewerenz complaining of pain throughout his back

---

[2]A July 30, 2001, x-ray of Plaintiff's spine and right shoulder revealed early degenerative changes with narrowing of the disc space between L5-S1 and straightening of the normal cervical curvature, probably due to muscle spasm (R. 165).

and across his shoulders with numbness and continued trouble sleeping (R. 156).  Dr. Lewerenz extended Plaintiff's disability for 30 days.

On September 12, 2001, Plaintiff was evaluated by Jasper E. McLaurin, M.D., due to headaches, neck and back pain (R. 94).  He noted that Plaintiff had been taking anti-inflammatory drugs and participating in therapy twice a week following his auto accident, but reported that these were not helping.  Upon examination Plaintiff exhibited tenderness in the cervical area and across both shoulders, more on the right, with complaints of pain upon manipulation of the right shoulder (R. 95).  Plaintiff also exhibited tenderness over both transverse carpal ligaments, and there was a positive Tinel and Phalen sign bilaterally.  There was tenderness in the lumbrosacral area.  There was full range of motion without difficulty, and Plaintiff was able to heel and toe and complete deep knee bends.  Straight leg raising was negative to 90 degrees, though Plaintiff complained of pain.  The neurological exam revealed weakness in grip bilaterally, greater on the right, with markedly decreased reflexes bilaterally.  There were no pathological reflexes, and there was some pass pointing and ataxia on coordination testing.  Electromyographic studies of the four extremities and the spine revealed nerve root compression at the level of L4-L5 on the right and L4-L5, L5-S1 on the left (R. 93).  No abnormalities were noted in the cervical segments.  Nerve conduction studies show evidence of severe bilateral peripheral neuropathy.  Dr. McLaurin diagnosed Plaintiff with muscle contraction cephalalgia, cervical sprain with right radiculitis,[3] lumbrosacral sprain with

---

[3] Swelling in the nerve roots due to local trauma.

bilataral radiculitis at L4-L5 and L5-S1, and severe peripheral neuropathy[4] (R. 95). Dr. McLaurin noted that Plaintiff exhibited evidence of carpel tunnel syndrome clinically and electromyographically, but that he did not have "any real symptoms" of the disorder.

On September 21, 2001, Plaintiff visited Dr. Lewerenz complaining of pain in his back radiating into right arm and right leg, and pain in his left shoulder (R. 153). Plaintiff stated that therapy helped temporarily. On September 26, 2001, Plaintiff complained of intense pain in his left shoulder radiating into his arm (R. 152).

On November 6, 2001, Plaintiff complained to Dr. Lewerenz of neck pain radiating into his lower back, headaches and soreness (R. 149).

On February 5, 2002, Plaintiff visited Dr. Lewerenz to follow up on a urine test that was positive for protein (R. 144). A second urine test confirmed both protein and blood in Plaintiff's sample, and Dr. Lewerenz scheduled an appointment for Plaintiff with a nephrologist.

On February 20, 2002, Fawaz Al-Ejel, M.D., met with Plaintiff for a consultation (R. 101, 105-109). Dr. Al-Ejel described Plaintiff as having a history of Type 2 diabetes with complications

---

[4] Peripheral neuropathy describes damage to the peripheral nervous system, the vast communications network that transmits information from the brain and spinal cord (the central nervous system) to every other part of the body. Peripheral nerves also send sensory information back to the brain and spinal cord, such as a message that the feet are cold or a finger is burned. Damage to the peripheral nervous system interferes with these vital connections. Like static on a telephone line, peripheral neuropathy distorts and sometimes interrupts messages between the brain and the rest of the body.

In the most common forms of polyneuropathy, the nerve fibers (individual cells that make up the nerve) most distant from the brain and the spinal cord malfunction first. Pain and other symptoms often appear symmetrically, for example, in both feet followed by a gradual progression up both legs. Next, the fingers, hands, and arms may become affected, and symptoms can progress into the central part of the body. Many people with diabetic neuropathy experience this pattern of ascending nerve damage.

of retinopathy and a questionable history of neuropathy. Plaintiff reported that his blood sugar was fluctuating, that he had been diagnosed with hypertension three weeks prior and that he had been referred to Nephrology for protenuria. Upon examination Dr. Al-Ejel noted that Plaintiff's head and neck were normal, his skin revealed chronic changes from diabetes in his legs, no palpable lymphadenpathy, no acute arthritis or deformities (R. 102). His back revealed no CVA tenderness. Dr. Al-Ejel determined that Plaintiff had diabetic nephropathy, microhematuria,[5] hypertension uncontrolled, diabetes mellitus, Type 2 and diabetic retinopathy. Dr. Al-Ejel suggested that Plaintiff needed better blood pressure control, a renal ultrasound, a consultation with a dietician, blood test to rule out Hepatitis and a follow-up examination. A February 22, 2002, blood test produced a negative result for Hepatitis (R. 103-104).

A February 26, 2002, ultrasound of Plaintiff's abdomen revealed a slight increase in the echogenicity of the kidneys, suggesting medical renal disease, with no hydronoephrosis or other abnormalities (R. 97). Plaintiff also received Pre-Renal Diet counseling on this date (R 98).

Dr. Al-Ejel saw Plaintiff on May, 2, 2002, at which time Plaintiff had no complaints (R. 100). A June 13, 2002, follow-up appointment with Dr. Al-Ejel was apparently cancelled (R. 99).


On May 2, 2002, Plaintiff was seen at the Hakim Eye Center, where he has been a patient since January 2002 (R. 131-133). Hasan B. Hakim, M.D. diagnosed Plaintiff with diabetic retinopathy, which he explains was treated with a laser but will require continued medical attention (R. 132).

On July 10, 2002, Plaintiff visited Dr. Lewerenz "for work restrictions" and had "no

---

[5]Blood in the urine.

7

complaints at this time" (R. 142).  Dr. Lewerenz wrote a letter which explained that Plaintiff was diagnosed with hypertension, renal insufficiency, non-insulin dependant diabetes, diabetic retinopathy, cervical/thoracic/lumbar fibromyositis, and cervical/lumbar radiculitis. Yet, he did not place Plaintiff on work restrictions at this time (R. 141).

On July 14, 2002, Plaintiff was seen in the emergency room for a lumber muscle strain (R. 110) after he strained his lower back lifting luggage while working at the airport (R. 115).  His discharge instructions indicated that he should rest, take anti-inflammatory medicines, avoid siting for long periods of time, or activity that hurts back muscles and add moderate exercise after the first few days (R. 110-111).  Plaintiff was to follow-up with his own physician (R. 110).  Plaintiff was given work restrictions of no heavy lifting or prolonged standing for 3 days (R. 113).  A July 16, 2002, lumbosacral spine x-ray revealed no significant abnormality, the bones, joints and disc spaces all appeared normal and the sacroiliac joints were "undeformed" (R. 120).

On July 18, 2002, Plaintiff visited Dr. Lewerenz as a follow-up from to his emergency room visit (R. 140).  Plaintiff stated that he had decreased pain in his lower back and Dr. Lewerenz prescribed range of motion exercise and no work until July 29, 2002 (R. 140, 139).

On July 29, 2002, Plaintiff visited Dr. Lewerenz complaining of low back pain with numbness and swelling in his lower extremities (R. 138).  He also complained that his sleep had been decreased due to pain, and that standing caused a constant ache in his legs.  Dr. Lewerenz completed a form letter indicating that Plaintiff was disabled from work for 30 days due to "chronic C&L fibromyositis, HTN, NRC L-spine, L+R, PVD" (R. 137).

On July 31, 2002, Plaintiff was seen in the emergency room for reported dizziness and emesis (R. 121) and was diagnosed with acute vertigo (R. 124).  A head CT revealed that the

8

ventricles were of normal size and configuration, the basal cisterns and sulci over the convexities were normal and no abnormal densities were noted in the brain parenchyma (R 130). Plaintiff was discharged the same day upon recovery (R. 126).

On August 29, 2002, Plaintiff visited Dr. Lewerenz, who recommended that Plaintiff remain off work for 30 days and return to the office in 1-2 months, while continuing a range of motion and heat program at home (R. 135). Dr. Lewerenz's diagnosis was chronic cervical and lumbar fibromyositis, hypertension, non-insulin dependant diabetes mellitus, microhematuria - chronic, and protenuria.

On September 20, 2002, Plaintiff visited Dr. Lewerenz to ask for a handicap parking permit, have his blood pressure checked and have some personal questions answered (R. 134). At this time Plaintiff was taking Glucorance, Elavil, Esgic Plus, Altace and Lasix . Plaintiff was noted to have no complaints. Dr. Lewerenz provided a 6 month handicap parking permit, placed Plaintiff on a diabetic and low protein diet, and asked him to return in 3 months.

On October 12, 2002, state agency consultant David Mika, D.O., completed the *Physical Residual Functional Capacity Assessment Form* (R. 85-92). He found Plaintiff to have the RFC to occasionally lift 20 pounds, frequently lift 10 pounds and stand/walk or sit for 6 hours in an 8 hour workday (R. 86); with frequent balancing, kneeling and crawling; occasional climbing ramps and stairs, stooping and crouching and crouching; but never climbing ladders, ropes or scaffolds (R. 87). Dr. Mika also found Plaintiff to have no limitations in pushing and/or pulling (R. 86), but suggested avoidance of concentrated exposure to extreme cold and hazards (R. 89). Dr. Mika found Plaintiff's complaints of pain in his neck, right shoulder, low back and legs "partially credible when compared to medical" activities of daily living (R. 90).

9

### b.  After Expiration of Insured Status on December 31, 2002

On November 28, 2003, Dr. Al-Ejel wrote a letter to Dr. Lewerenz explaining that he had recently seen Plaintiff regarding his rising creatinine (R. 166).  He described Plaintiff as non-compliant on his diet and explained that his blood sugar was out of control.  He suggested that Plaintiff should be started on long-acting insulin, and explained that he suggested a kidney biopsy on Plaintiff's last visit, in view of Plaintiff's rising creatinine, but that Plaintiff refused.

### 3.      Vocational Evidence

Elaine Tripi served as the vocational expert (the "VE") in this matter (R. 221).  VE Tripi characterized Plaintiff's past work as medium exertional, unskilled to semi-skilled with no transferable skills for sedentary work (R. 222-223).

ALJ Freedman asked VE Tripi to consider whether Plaintiff could perform his past work or any jobs in the general economy considering the following factors: Plaintiff's age, education and work experience, and a finding that he can perform only sedentary work; avoiding uneven surfaces, working around heavy machinery, and power tools; having a sit/stand option; lifting no more than 10 pounds occasionally and 5 pounds frequently; with no extensive knowledge of English for work requiring reading and writing (R. 224-225).

VE Tripi opined that Plaintiff could not perform his past work, but could perform unskilled bench work involving simple tasks such as sorting, packaging, assembly and the like, and stated that there were 7,500 such jobs in the Detroit area with a sit/stand option (R. 225).

If Plaintiff's testimony was fully credited, VE Tripi responded that his complaints of pain throughout his body and his need to rest during the day would be preclusive of all employment (R. 225-226).

10

### 4.    The ALJ's Decision

ALJ Freedman found that Plaintiff met the disability insured requirements of the Act through December 31, 2002, and that he had not engaged in substantial gainful activity since his alleged onset date of July 14, 2002 (R. 24).

Plaintiff was severely impaired, as defined in the regulations 20 C.F.R. 404.1520(c) and 416.920(b), by disorders of back and kidney problems, diabetes mellitus and hypertension (R. 24). These impairments did not meet or equal the requirements of any impairment listed in Appendix 1, Subpart P, of Regulations No. 4 (the "Listing").

Plaintiff's allegations regarding his limitations were not totally credible. He was a younger individual, with a limited education and was unable to perform his past work.

Plaintiff had the residual functional capacity ("RFC") to perform a significant range of sedentary work with the following limitations: avoid uneven surfaces, work around heavy machinery and power tools; sit/stand option based upon Plaintiff's physical needs; lifting no more than ten pounds occasionally and five pounds frequently; no extensive knowledge of the English language in terms of reading and writing.

Using the Medical-Vocational Guidelines as a framework, together with the testimony of the VE, ALJ Freedman determined that Plaintiff could perform a significant number of jobs in the economy, referring to the limited number of sedentary jobs identified by the VE, and Plaintiff was, therefore, not disabled (R. 24-25).

## II.    ANALYSIS

### A.    Standard Of Review

In adopting federal court review of Social Security administrative decisions, Congress

11

limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[6] A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

**B.    Factual Analysis**

Plaintiff raises two challenges to the Commissioner's decision: (1) the ALJ erred in not finding Plaintiff's arm and hand impairments to be severe and not including the resulting limitations in Plaintiff's RFC; (2) the ALJ erred by not according sufficient weight to Plaintiff's treating physician's

---

[6] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

opinion.

### 1.   Failure to Find Certain of Plaintiff's Impairments to be "Severe"

The term "severe" serves two major functions in a Social Security disability determination. Having one or more severe impairments is a threshold requirement at step 2 of the Commissioner's five step sequence of evaluation.  Regulations provide for a determination that a claimant is not disabled on the ground that the individual does not have a severe impairment – i.e., an impairment that places a significant limit on the individual's physical or mental ability to do basic work activities.[7] S.S.R. 85-28; *Bowen v. Yuckert*, 482 U.S. 137 (1987).  Justices O'Connor and Stevens agreed in their concurring opinion in *Yuckert* that "step 2 may not be used to disqualify those who meet the statutory definition of disability. . . .  Only those claimants with slight abnormalities that do not significantly limit any `basic work activity' can be denied benefits without undertaking this vocational analysis."  *Id.* at 158. Other articulations of the narrow circumstances in which the

---

[7] 20 C.F.R. § 404.1521 [20 C.F.R. § 416.921 for SSI] defines an impairment that is not severe:

> (a) Non-severe impairment(s).   An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.
>
> (b) Basic work activities.   When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include--
>
> > (1)    Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> > (2)    Capacities for seeing, hearing, and speaking;
> > (3)    Understanding, carrying out, and remembering simple instructions;
> > (4)    Use of judgment;
> > (5)    Responding appropriately to supervision,  co-workers and usual work situations; and
> > (6)    Dealing with changes in a routine work setting.

severity regulation can be applied are found in the earlier circuit opinions approved of by Justices

O'Connor and Stevens.  For example, the Sixth Circuit declared that:

> [w]e therefore agree ... that in order to ensure consistency with statutory disability standards, an impairment can be considered as not severe, and the application rejected at the second stage of the sequential evaluation process, only if the impairment is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience."

*Farris v. Secretary,* 773 F.2d 85, 89-90 (6th Cir. 1985) (quoting *Brady v. Heckler*, 724 F.2d

914, 920 (11th Cir. 1984)).  Thus, Step 2 can be used as a screening device for benefit claims

involving *de minimis* impairments.

In addition, at step 5, hypothetical questions posed to the vocational expert must define the

hypothetical worker's residual functional capacity.  The hypothetical question may omit non-severe

impairments, *Benenate v. Schweiker,* 719 F.2d 291, 292 (8th Cir. 1983), but not impairments found

by the ALJ to be severe,  *Pendley v. Heckler,* 767 F.2d 1561, 1563 (11th Cir. 1985).  This suggests

that, other than impairments having only a minimal effect on the individual that would not be

expected to interfere with the individual's ability to work, impairments with vocational consequences

that might limit the capacity to work – i.e. those that meet the "severe" threshold definition – should

be taken into consideration in a legally complete hypothetical question.

In his decision ALJ Freedman explained that "a medically determinable impairment or

combination of impairments is 'severe' if it significantly limits an individual's physical or mental

ability to do basic work activities" and that severe impairments "must be considered in the remaining

steps of the sequential analysis" (R. 17 citing 20 C.F.R. 404.1520, 416.920, 404.1523 and 416, 923).

ALJ Freedman found Plaintiff to be severely impaired "within the meaning of the Regulations" by

disorders of the back, kidney problems, diabetes mellitus and hypertension .  He did this in his step 2 analysis before turning to the Listing of Impairments at step 3.  Plaintiff alleges that the ALJ erred in failing also to find that he had severe "arm and hand impairments"(Plaintiff's Brief, p. 4).

Yet, even if Plaintiff does have severe arm and hand impairments, Plaintiff's argument does not warrant a remand if the ALJ continued with steps 3-5 of the disability sequential evaluation and considered all relevant medical conditions in his residual functional capacity finding at step 5. *Maziarz v. Secretary of Health & Human Services*,  837 F.2d 240, 244 (6th Cir., 1987), held that an ALJ who noted cardiovascular impairments as severe at step 2 of the sequential evaluation (and thus did not deny benefits at that step) need not identify the claimant's cervical impairments as also being severe because the decision-maker "could consider claimant's cervical condition in determining whether claimant retained sufficient residual functional capacity to allow him to perform substantial gainful activity."  *Maziarz* oddly states "[w]e find it unnecessary to decide this question" and then decides it in favor of the defendant with very little analysis.  The court also focuses its analysis primarily on the step 2 use of the term "severe," and found no reversible error because the administrative decision maker "properly could consider claimant's cervical condition" in determining a residual functional capacity under 20 C.F.R. 404.1545.  It seems that the opinion should have made it clearer that the ALJ had to consider any cervical limitations during relevant time periods in formulating the residual functional capacity used in the hypothetical question to the VE unless the ALJ could discount the seriousness of the cervical problem or restricted its duration or onset date.

In *Maziarz* the claimant had performed heavy work, and the hypothetical question the district judge and Sixth Circuit upheld was sedentary work including teacher's aide, cashier, self-service gas

station attendant and telephone answering service operator.  The court did not find reversible error in not expressly dealing with the cervical problem, but it seems these jobs would not be affected by any but a more severe cervical limitation.

In the present case the ALJ relied on vocational testimony on the availability of 7,500 unskilled bench work jobs with a sit/stand option involving simple tasks such as sorting, packaging, assembly and the like in the Detroit area (R. 225).  Plaintiff argues that his weak bilateral grip, positive Tinel and Phalen signs, and nerve conduction study indicating cervical sprain with right radiculitis indicate that he has an arm and hand impairment that would interfere with his ability to perform this work (Plaintiff's Brief, p. 5-6).  Yet, as ALJ Freedman noted (R. 22), the medical records do not indicate any complaints by Plaintiff of problems with the use of his hands.  In fact, in the same report which indicates that Plaintiff had positive Tinel and Phalen signs, Dr. McLaurin stated that Plaintiff "doesn't have any real symptoms of" carpel tunnel syndrome (R. 95).  Even on the first date Dr. Lewerenz found Plaintiff to be totally disabled from work following his auto accident, he still felt Plaintiff was able to perform grasping and fine manipulation with both hands, though not the pushing and pulling of arm controls (R. 163).  In his disability application Plaintiff lists as his "illnesses, injuries or conditions that limit [his] ability to work," kidney problems, diabetes, hypertension and eye problems, but not arm or hand problems (R. 61).  Further, when asked "What is it about your health that you believe keeps you from working?" Plaintiff responded my back, my shoulder and my neck (R. 213).  He indicated that his right shoulder hurt down to his hand, but when asked whether the pain interfered with his ability to use his right arm he answered "Well, when its hurting me a lot, you know sharp pain–it does hurt me when I try to write something" (R. 214).  The state agency consultant did not limit Plaintiff's RFC for pushing/pulling or manipulating

16

at all, and attributed Plaintiff with the ability to lift 20 pounds occasionally and 10 pounds frequently (R. 85-92), i.e. light work as defined by the Regulations.[8]

Therefore, there is substantial evidence in the record from which a reasonable factfinder could conclude that Plaintiff's alleged arm and hand impairments are not severe. Further, the ALJ restricted Plaintiff to a limited range of sedentary work with no work around heavy machinery or power tools and no lifting over ten pounds. It is not apparent that any impairment was not adequately accommodated in this restricted RFC or would likely preclude a significant number of jobs identified by the VE and relied on by the ALJ. Thus, as in *Maziarz*, there is no error on this issue warranting a remand.

### 2.    Proper Use of Dr. Lewerez's Opinion

It is well established that the findings and opinions of treating physicians are entitled to substantial weight. The case law in this circuit has stated that if adequately supported by objective findings, and if uncontradicted by other substantial medical evidence of record, a treating physician's opinion of disability was binding on the Social Security Administration as a matter of law.[9] The

---

[8]    Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. §404.1567

[9]*See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same); *Bowie v. Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980).

administrative decision could reject a properly supported treating physician's opinion of disability if the record contains "substantial evidence to the contrary." *Hardaway v. § of HHS*, 823 F.2d 922, 927 (6th Cir. 1987). Yet, this law has been slightly modified by administrative regulation which gives the Commissioner broader discretion to reject certain treating physician opinions.

In August 1991, the Social Security Administration adopted a new regulation in response to the treating physician rules adopted by the various circuits. 20 C.F.R. §404.1527 [SSI § 416.927]. While the regulation indicates that the Commissioner will generally give more weight to the opinions of treating sources, it sets preconditions for doing so, which are more strict than those established by the Sixth Circuit. The 1991 regulation also limits the scope of the subject matters on which the Commissioner will give a treating source opinion greater weight.

Under the 1991 regulation, the Commissioner will only be bound by a treating source opinion when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record." 20 C.F.R. § 404.1527(d) [SSI § 916.927(d)]. *See also*, S.S.R. 96-2p. In those situations where the Commissioner does not give the treating physician opinion "controlling weight," the regulation sets out five criteria for evaluating that medical opinion in conjunction with the other medical evidence of record. Those five criteria are:

> (1) the length, frequency, nature and extent of the treatment relationship, including the kind and extent of examination and testing sought from specialists or independent laboratories;
> (2) the supportability of the medical opinion based on medical signs and laboratory findings, with better explanations being given more weight, and whether the opinion includes all of the pertinent evidence as well as opinions of treating and other examining sources;
> (3) the consistency of the opinion with the record as a whole;
> (4) specialty, with greater weight given to relevant specialists;
> (5) and other factors which tend to support or contradict the opinion.

*Wallace v. Comm'r. of Soc. §*, 367 F.Supp.2d 1123, 1133 (E.D. Mich. 2005).

The regulation also limits the subjects upon which the Commissioner must defer to a treating source opinion to "the issue[s] of the nature and severity of your impairment[s]." 20 C.F.R. § 404.1527(d)(2), [SSI § 916.927(d)(2)]. Under 20 C.F.R. § 404.1527(e) [SSI § 916.927(e)], the Commissioner will not defer or provide special significance to treating source opinions on certain subjects that are "reserved to the Secretary" which includes treating physician opinions on a claimant's disability under the Listing, on residual functional capacity or a general and conclusory statement of disability or inability to work. Thus, while deferring in part to the court-created "treating physician rule," the Commissioner's 1991 regulation in large measure rejects circuit case law that gives enhanced weight to treating physician opinions regarding disability under the Listing, on residual functioning capacity, or on general statements of disability.

In 20 C.F.R. 404.1513(b) & (c) [SSI § 416.913 (b) & (c)] and SSR 96-5p the Commissioner distinguishes between a treating source "statement about what [a claimant] can still do despite . . . impairment(s)" and the formal administrative finding on "residual functional capacity" (RFC). The former is a physician's opinion on either physical or psychological capacities for work related activities. When based on the medical source's records, clinical and laboratory findings, and examinations it can be considered a "medical opinion" under §404.1527(a)(2) [SSI § 416.913(a)(2)] because "what [ a claimant] can still do despite impairment(s)" and "physical or mental restrictions" are medical judgments about the nature and severity of [a claimant's] impairment(s)" and thus fall within the Commissioner's definition of "medical opinion." Yet, because these medical opinions are different from the formal findings under §404.1527(e) [SSI § 416.913(e)] on "disability" and on "residual functional capacity" -- which are subjects reserved to the Commissioner and which may

19

be based on additional evidence in the record  -- the Commissioner need not defer to the treating source opinion except in the narrow case where the treating source opinion is to be given controlling weight under 20 C.F.R. §404.1527(d)(2) [§416.927(d)(2)], i.e. the treating sources' opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record."

In the present case, the portion of Dr. Lewerenz's opinion to which the ALJ was required to defer or at least treat with special significance was his diagnosis of hypertension, renal insufficiency, non-insulin dependent diabetes mellitus, diabetic retinopathy, cervical/lumbar/thoracic fibromyositis and cervical/lumbar radiculitis - a diagnosis which was considered by ALJ Freedman in determining Plaintiff's RFC (R. 17, 18-19, 21, 22).  While Plaintiff argues that the ALJ was also required to give deferential weight to Dr. Lewerenz's recommendation that he be considered permanently disabled, this is a subject that is left to the discretion of the Commissioner.  20 C.F.R.§ 404.1527(e)(1); *Workman v. Comm'r of Soc. §*, 105 Fed. Appx. 794, 800 (6th Cir., 2004)(A treating physician's conclusory statement that a claimant is disabled is not controlling because the ultimate determination of whether a claimant is disabled rests with the Commissioner.); *Wallace, supra*, 367 F.Supp.2d at 1133.  Therefore ALJ Freedman did properly consider Dr. Lewerenz's medical opinion in making his disability determination.

## III.   RECOMMENDATION

For the reasons stated above, It is Recommended that Defendant's Motion for Summary Judgment be GRANTED and Plaintiff's Motion for Summary Judgment be DENIED.   The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §

636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: October 31, 2005          s/Steven D. Pepe
Ann Arbor, Michigan           United States Magistrate Judge

Certificate of Service

I hereby certify that copies of the above were served upon the attorneys of record by electronic means or by U. S. Mail on October 31, 2005.

s/William J. Barkholz
Courtroom Deputy Clerk